UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 21-20111 (JJT) |
| | ) | |
| OLD CP, INC., *et al.*, | ) | |
| Debtors. | ) | Chapter 11 |
| | ) | |
| DENNIS ENGINEERING GROUP, LLC, | ) | |
| Plaintiff, | ) | Adv. Pro. Case No. 21-02004 (JJT) |
| | ) | |
| v. | ) | |
| | ) | RE: ECF Nos. 175, 222 |
| PEOPLE'S UNITED BANK, N.A. and | ) | |
| BMO HARRIS BANK, N.A., | ) | |
| Defendants. | ) | |

## FIRST MEMORANDUM OF DECISION AND RULING ON
## PARTIAL CROSS-MOTIONS FOR SUMMARY JUDGMENT

Before the Court are two motions for summary judgment. The Plaintiff, Dennis Engineering Group, LLC ("Dennis Group"), has moved for partial summary judgment on Counts Two, Six and Seven of its Complaint. Pl.'s Partial Mot. for Summ. J., ECF No. 175 (the "Partial MSJ"). Count Two asserts a claim for fraud, Count Six asserts a claim for breach of the duty of good faith and fair dealing, and Count Seven asserts a claim for breach of contract.

The Defendants, People's United Bank, N.A. ("PUB") and BMO Harris Bank, N.A. ("BMO") (collectively, the "Lenders"), have moved for partial summary judgment on Count One of Dennis Group's Complaint and Count One of the Lenders' Counterclaim. Defs.' Partial Mot. for Summ. J., ECF No. 222; Defs.' Mem. in Support, ECF No. 223 (the "Cross-Motion" and together with the Partial MSJ, the "Motions"). Each of these Counts seek a ruling by this Court (the "First Summary Judgment Ruling") and a declaratory judgment related to the validity of Dennis Group's mechanic's lien and the subordination of that lien, among other things.

The parties' claims arise from the construction of an expanded production facility for Carla's Pasta, Inc. ("Carla's") and Suri Realty, LLC ("Suri"), the Debtors[1] in the underlying Chapter 11 bankruptcy case. These Motions are the first of several rounds of summary judgment motions for the Court to consider in this action, and primarily address two questions: (1) whether the Lenders were required to provide notice to Dennis Group of a default by the Debtors under their lending agreement with the Lenders, and (2) whether Dennis Group's subordination of its mechanic's lien is presumptively valid and enforceable. The parties have separately addressed the timeliness and validity of Dennis Group's mechanic's lien in a second set of summary judgment motions,[2] which this Court will address in a separate decision (the "Second Summary Judgment Ruling").

For the reasons set forth below, Dennis Group's Partial Motion for Summary Judgment is DENIED on Counts Two, Six, and Seven of its Complaint. The Lenders' Partial Cross-Motion for Summary Judgment is GRANTED, in part, on Count One of Dennis Group's Complaint and Count One of the Lenders' Counterclaim, but only as to the portions of those claims that relate to the presumptive validity of Dennis Group's subordination of its mechanic's lien.

## I.    JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceedings under 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter on reference from the District Court under 28 U.S.C. § 157(a) and

---

[1] Upon the closing of the sale of the Debtor's assets in the main bankruptcy case, Carla's Pasta changed its name to Old CP, Inc. *See* Order Approving Sale of Debtor's Assets, BR-ECF No. 486, No. 21-20111; Debtor's Notice of Amendment of Corporate Name, ECF No. 946, No. 21-20111.
[2] In the second set of summary judgment motions, the parties have cross-moved on Count One of the Complaint and Count One of the Counterclaim, both of which seek further declaratory relief. *See* Defs.' Partial Mot. for Summ. J. (ECF No. 215); Pl.'s Partial Cross-Motion for Summ. J. (ECF No. 270).

(b)(1) and the General Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56, made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056, directs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Upon consideration of a motion for summary judgment, "all reasonable inferences are to be drawn, and all ambiguities resolved, in favor of the non-moving party." *In re Bak*, 2013 WL 653073, at *3 (Bankr. D. Conn. 2013) (citations omitted). Additionally, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby, Inc.*, 477 U.S. at 249.

"The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact." *Boland v. Wilkins,* 2020 WL 4195740, at *1 (D. Conn. 2020) (citing *Celotex,* 477 U.S. at 323). Although the evidence relied upon at the summary judgment stage need not be presented in admissible form, it must be capable of being presented at trial in admissible form. *In re Soundview Elite Ltd.,* 543 B.R. 78, 100–01 (Bankr. S.D.N.Y. 2016) ("[Rule 56(c)(2)] provides for the exclusion of matter that cannot be presented in a form that

3

would be admissible in evidence—not that is *not* so presented." (emphasis in original)). The moving party may satisfy its burden "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.,* 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotations and citations omitted).

If the movant successfully demonstrates that there is no genuine issue of material fact, then the burden shifts to the non-movant to "set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Official Comm. of Unsecured Creditors of Affinity Health Care Mgmt., Inc. v. Wellner (In re Affinity Health Care Mgmt., Inc.)*, 499 B.R. 246, 251 (Bankr. D. Conn. 2013) (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby, Inc.*, 477 U.S. at 247–48 (emphasis in original).

Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law based on the undisputed facts. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "Moreover, even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." *Id.* "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.*

III.    **BACKGROUND**[3]

A.  **Overview**

For over forty years, Carla's was an artisan ravioli and pasta company located in South

Windsor, Connecticut. Carla's affiliate, Suri, owned the two properties used by Carla's for

manufacturing its products, 50 Talbot Lane and 280 Nutmeg Road in South Windsor,

Connecticut (the "Properties"). Prior to entering bankruptcy, Suri and Carla's were in the process

of expanding the Properties to construct a new, state-of-the-art production and co-packing

facility (the "Project") designed to accommodate the growing demand from several large

customers including Applebee's, Panera, Nestle, Stouffers, and Lean Cuisine. The main driver of

the Project was an estimated $30 million in annual sales for a single product line for Applebee's.

On June 6, 2017, Suri entered into an Agreement for Engineering and Construction Management

Services (the "Construction Contract") with Dennis Group to design, engineer, manage, and

construct the Project. *See* Ex. A to Tom Dennis Aff., ECF No. 175-6.

The Debtors sought financing for the Project from the Lenders. On October 4, 2017, the

Debtors entered into a Third Amended and Restated Credit Agreement (the "Credit Agreement")

with the Lenders, under which the Lenders agreed to extend an aggregate loan of $62 million. [4]

The loan included, among other things, construction financing for the Project in the amount of

$19 million. To secure repayment of the Debtors' obligations to the Lenders, the Debtors

executed a series of security agreements, including a mortgage on the Properties in favor of the

Lenders.

---

[3] The introductory factual background in this section is derived from the admitted allegations in the Defendants' Answer, as well as the undisputed facts derived from the parties' D. Conn. Civ. L. R. 56(a) statements. Not all of these facts are determinative of the Court's ultimate decision but are provided for contextual purposes to explain the facts and circumstances giving rise to this Adversary Proceeding.

[4] At all relevant times herein, PUB was acting in its capacity as the administrative agent for itself and for BMO, as well as acting as a co-lender, in relation to the loan extended to the Debtors under the Credit Agreement. *See* Credit Agreement, ECF No. 223-2 at 2, 10, 32, 43, 160–61; Second Amend. Answer ¶¶ 5–6.

Not long after the Lenders and Debtors entered into the Credit Agreement, Carla's financial health began to decline. Several challenges preceding the COVID-19 pandemic precipitated this distress, including the loss of the $30 million Applebee's product line, a nationwide decline in pasta sales, increased operational costs, and several increases to the construction budget caused by unforeseen costs related to accommodating Nestle's high standards for hygiene requirements in the new facilities. The onset of the pandemic presented additional challenges. Between March 2018 and the filing of the Debtors' respective bankruptcies in 2020 and 2021, these ongoing financial challenges would trigger eight events of default under the Credit Agreement. The Lenders and Debtors entered into six forbearance agreements during this time as well.

By September 19, 2018, the Lenders had frozen further draw-downs on the construction credit line until Carla's submitted a balanced budget. Carla's sought additional financing to complete the Project in the form of mezzanine debt and a potential sale-leaseback of the Properties, but its efforts were unsuccessful. Construction on the Project continued throughout these challenges, as Dennis Group had extended its payment terms for Suri to 120 days. On December 23, 2019, after allegedly completing the Project without payment in full for its work and services, Dennis Group filed a mechanic's lien for the unpaid balance of the Construction Contract. Dennis Group subsequently forced Suri into an involuntary Chapter 7 bankruptcy in this Court in October 2020, and Carla's joined Suri with its own voluntary Chapter 11 bankruptcy petition not long after in February 2021.[5]

Central to the claims in this case is a Consent Agreement (the "Consent") by and between Dennis Group and Suri and dated October 2, 2017, which the Lenders required Dennis Group to

---

[5] After Suri's involuntary case was converted to a voluntary Chapter 11 case, Suri and Carla's bankruptcy proceedings were administratively consolidated. *See* BR-ECF No. 91, Case No. 21-2111.

execute as a condition to lending funds to the Debtors. The Consent, executed two days before the Credit Agreement, contained various notice requirements and contained Dennis Group's consent to subordinate its mechanic's lien to the Lenders' mortgage on the Properties. Dennis Group separately agreed to subordinate its mechanic's lien to the Lenders' mortgage twice via a set of ancillary subordination agreements.

The critical dispute between the parties focuses on whether the Consent required the Lenders to give notice to Dennis Group of the Debtors' events of default under the Credit Agreement. Dennis Group admits that it subordinated its mechanic's lien, giving the Lenders a first-priority lien on the Properties, but contends that the subordination is unenforceable because the Lenders failed to give Dennis Group notice of the Debtors' events of default. Dennis Group argues that, had it received notice from the Lenders, it would have ceased construction instead of completing the Project. The Lenders disagree, claiming they were not obligated to provide such notice and that, to the contrary, Dennis Group breached the Consent by failing to provide the Lenders with notice of a default by Suri under the Construction Contract.

### B. Procedural History

On October 29, 2020, Dennis Group forced Suri into bankruptcy by filing an involuntary petition for relief under Chapter 7 of the Bankruptcy Code.[6] Upon Suri's motion to convert the case (BR-ECF No. 30, Case No. 21-21270),[7] the Court entered an order on December 17, 2020, converting the involuntary Chapter 7 bankruptcy case to a voluntary case under Chapter 11 of the Bankruptcy Code. On February 8, 2021, Carla's filed its own voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[8] The Properties were sold through a judicial sale

---

[6] The involuntary petition was filed against Suri in this Court under Case No. 20-21270.
[7] All citations to documents in the underlying bankruptcy cases for Suri and Carla's are referenced with the "BR-ECF" designation followed by the document number and the relevant case number.
[8] Carla's filed its voluntary petition in this Court under Case No. 21-20111.

proceeding under 11 U.S.C. § 363 during the administratively consolidated Chapter 11 proceedings of the Debtors, with all liens and interests initially attaching to the proceeds of the sale, which were held in escrow. After the sale, the Lenders requested an interim disbursement of $15,000,000 from the sale proceeds, conditioned upon providing adequate protection for Dennis Group's primary claim in the form of a surety bond. *See* BR-ECF No. 564, Case No. 21-20111. The Court granted the request and approved the substitution of a surety bond in the amount of $15,418,497 in lieu of rights in the sale proceeds, with Dennis Group's interest in the sale proceeds, if any, now attaching to the bond. *See* BR-ECF No. 781, Case No. 21-20111. The gravamen of the parties' disputes before the Court involve each party's claimed first lien entitlement to those sale proceeds. If Dennis Group should prevail in that contest, it would be paid under the terms of the surety bond. If the Lenders should prevail, the bond would be terminated, and Dennis Group would have no likely financial recovery on its claims.

In an effort to determine its right to receive certain proceeds from the sale of the Properties as payment for its services, Dennis Group (the "Plaintiff") commenced this Adversary Proceeding on March 10, 2021 by way of Complaint against the Lenders. Compl., ECF No. 1. The Complaint seeks a declaratory judgment determining that Dennis Group's mechanic's lien is valid, prior in right, and enforceable; that the Consent is unenforceable; and, that the Lenders' mortgage is invalid; or, alternatively, that the subordination documents are invalid due to Dennis Group's unilateral mistake of fact.[9] Dennis Group also asserts claims for breach of contract,

---

[9] Dennis Group does not fully explain the basis for claiming that the subordination documents are invalid based on Dennis Group's alleged unilateral mistake of fact. The only reference to a "unilateral mistake of fact" is found in Count One of Dennis Group's complaint for a declaratory judgment, *see* Compl. ¶ 70, wherein Dennis Group asserts that it was "mistaken about whether the Debtor Parties had defaulted on their obligations" to the Lenders, *see* Compl. ¶ 71. Dennis Group's only discussion of this "mistake" in its Partial MSJ occurs in the context of its claim for fraud under Count Two of the Complaint. Separately, in Count One, Dennis Group claims that the first subordination of its mechanic's lien was invalid or ineffective because it was not recorded. *See* Compl. ¶ 74. However, in its Rule 56(a)(2) Statement and again at oral argument, Dennis Group admitted that the subordination

fraud, negligent misrepresentation, tortious interference, equitable subordination under 11 U.S.C. § 510(c), unjust enrichment, breach of the duty of good faith and fair dealing, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110, *et seq.*

On June 18, 2021, Lenders filed their Answer to the Complaint and asserted affirmative defenses and a Counterclaim against Dennis Group.[10] Answer, ECF No. 24; Amend. Answer, ECF No. 72. In Count One of their Counterclaim, Lenders seek a declaratory judgment determining that Dennis Group's mechanic's lien is invalid and unenforceable; that the services and construction work comprising the mechanic's lien are not lienable; that the rights of subcontractors are subordinated to Dennis Group's mechanic's lien; or, alternatively, to the extent the mechanic's lien is valid, that Dennis Group effectively subordinated its mechanic's lien to the Lenders' mortgage. The Lenders also assert claims for breach of contract, equitable subordination under 11 U.S.C. § 510(c), fraudulent inducement, tortious interference, and CUTPA violations.

On January 26, 2022, Dennis Group moved for partial summary judgment of its claims asserted in Count Two for fraud, Count Seven for breach of contract, and Count Six for breach of the duty of good faith and fair dealing. On its breach of contract and breach of the duty of good faith and fair dealing claims, Dennis Group seeks summary judgment establishing that the Lenders and Dennis Group are parties to the Consent, that Dennis Group performed its obligations under the Consent, and that the Lenders failed to perform their obligations under the

---

of its mechanic's lien was knowing, voluntary, and valid, making these aspects of its declaratory judgment claim undisputed. *See* Pl.'s Stmt. ¶¶ 12, 14.

[10] Both Dennis Group and the Lenders amended their pleadings more than once throughout this proceeding. *See* Defs.' First Amend. Answer and Counterclaim (ECF No. 31); Pl.'s Reply to Answer and Counterclaim (ECF No. 33); Defs.' Second Amend. Answer and Counterclaim (ECF No. 72); Pl.'s Reply to Second Amend. Answer and Counterclaim (ECF No. 85). The background information focuses only on the operative pleadings at the time the parties filed their motions for summary judgment.

Consent in bad faith by failing to give notice to Dennis Group of the Debtors' defaults under the Credit Agreement. On its fraud claim, Dennis Group seeks summary judgment establishing that the Lenders failed to give notice to Dennis Group under the Consent of an event of default by the Debtors under the Credit Agreement when it knew the Debtors had triggered multiple events of default and knew that its failure to give notice would cause Dennis Group to continue performing work on the Project to its detriment. Dennis Group has sought summary judgment as to liability only on each of these claims, leaving the issue of causation and damages for trial.

On March 16, 2022, Lenders opposed the Partial MSJ and cross-moved for partial summary judgment on Count One of the Complaint and Count One of its Counterclaim, both of which also seek declaratory judgments. On Count One of the Lenders' Counterclaim, Lenders seek a declaratory judgment stating that Dennis Group's subordination of its mechanic's lien is valid and enforceable, leaving the remaining components of their declaratory judgment claim regarding the timeliness and validity of Dennis Group's mechanic's lien for trial. The Lenders' Cross-Motion only implicates the portion of Dennis Group's declaratory judgment claim regarding the enforceability of the Consent and the validity of the subordination of the mechanic's lien. Other aspects of Dennis Group's declaratory judgment claim, such as the ultimate validity of the mechanic's lien and the Lenders' mortgage, are not at issue in either of the summary judgment motions currently before the Court and have been reserved for further proceedings.

The Court held oral argument on both Motions on April 8, 2022, after which the Court took the matter under advisement. Following oral argument, and after deposing BMO, Dennis Group filed a supplement to its Partial MSJ on May 6, 2022, purportedly to aid the Court in deciding its Partial MSJ, by arguing that the Court could find the Lenders liable for breach of the

Consent as third-party beneficiaries. Dennis Group argued that a finding of liability against the Lenders on those grounds may relieve the Court of having to address other theories of liability under which Lenders could be bound by the Consent. Pl.'s Supp. in Support of Partial MSJ, ECF No. 289. This filing triggered a series of supplemental briefs, which the Court allowed pursuant to a briefing schedule so that the Lenders could appropriately respond to Dennis Group's additional arguments. *See* ECF Nos. 289–306. The supplemental briefing schedule concluded on July 5, 2022. All of the parties' submissions related to these Motions have been carefully reviewed several times by the Court in the formulation of this decision.

### C.  Undisputed Material Facts

The Court begins by stating the material facts as to which there is no genuine dispute, as presented by the parties in their Rule 56 Statements. *See Liberty Lobby, Inc.*, 477 U.S. at 247–48.

### 1.  The Credit, Consent, and Subordination Agreements

Pursuant to the Credit Agreement, Lenders agreed to extend financing to the Debtors in an aggregate amount of up to $62 million, which included $19 million of construction financing for the Project. Defs.' Rule 56(a)(2) Statement of Material Facts ¶¶ 4–5 (ECF No. 224, "Defs.' Stmt."). To secure repayment of the Debtors' obligations to the Lenders, the Debtors executed a series of security agreements, including a mortgage on the Properties. *Id.* ¶ 6.

Lenders, however, only agreed to lend money to the Debtors if they were assured a first-priority lien on the Properties. *Id.* ¶ 7. On October 2, 2017, Dennis Group executed the Consent, as well as an Individual Subordination of Mechanic's Lien as to Lien of Mortgage (the "First Subordination Agreement). Pl.'s Rule 56(a)(2) Statement of Material Facts ¶ 8 (ECF No. 256, "Pl.'s Stmt."). Dennis Group later affirmed the subordination of its mechanic's lien rights when

it executed a second Subordination of Mechanic's Lien as to Lien of Mortgage on October 2, 2018 (the "Second Subordination Agreement").[11] *Id.*

Importantly, Dennis Group admits to knowingly executing the Subordination Documents. *Id.* ¶ 12. John Lapinski ("Lapinksi"), Dennis Group's Controller, executed and signed each of these documents. *Id.* ¶ 8. Prior to its execution, Lapinski called the Consent "a fairly standard agreement when a project is being financed through a bank." *Id.* ¶ 9. He also testified that he knew, when signing the Consent and the First Subordination Agreement, that the documents would subordinate Dennis Group's mechanic's lien to the Lender's mortgage. *Id.* ¶ 34–35. In connection with the execution and delivery of these documents, Dennis Group never discussed the Consent or the two Subordination Agreements with any representative of Lenders, *id.* ¶ 30, and later never reached out to the Lenders to inquire about the status of the funding for the Project, *id.* ¶ 31. Tom Dennis, the founder and President of the Dennis Group, testified that Dennis Group did not ask the Debtors whether they were current on their loan obligations with the Lenders at any time after executing the Consent. *Id.* ¶ 32. The lack of communication between Dennis Group and the Lenders concerning the Consent and the two Subordination Agreements and the Debtors' financial condition leaves a disturbing void in the factual record on summary judgment.

Dennis Group did, however, discuss the Consent and the Subordination Agreements with Carla's and Carla's legal counsel. Kevin King ("King"), Dennis Group's project manager for the expansion Project, had several communications with James Connor of Updike, Kelly & Spellacy, P.C. ("Attorney Connor"), who served as legal counsel for Carla's. John Lapinski Dep. at 18:3–4, ECF No. 223-4. On September 29, 2017, Attorney Connor emailed King to confirm that he

---

[11] The First and Second Subordination Agreements are collectively referred to as the "Subordination Agreements." The Subordination Agreements and the Consent are collectively referred to as the "Subordination Documents."

had accepted Dennis Group's revisions to the Consent. Pl.'s Stmt. ¶ 1. The email does not identify the substance of the revisions.

## 2. The Construction Contract

Dennis Group and Carla's communications also included discussion about the progress of the expansion Project. Tom Dennis and Kevin King remained in close contact with Attorney Connor and Sergio Squatrito ("Squatrito"), the Senior Vice President of Operations for Carla's. They frequently discussed the status of payments to subcontractors, the rights to a mechanic's lien, the payment terms of the Construction Contract, and many other aspects of the Project. Several of these communications occurred by email:

- On September 25, 2018, Tom Dennis emailed Lapinski stating "I am scheduled to visit with Sergio today. Can you give me a summary of the advanced payments to date and the amount of this 'ask' so that I can advise Sergio of how far we are extended." *Id.* ¶ 18.

- On September 26, 2018, Tom Dennis emailed Lapinski approving an additional $1,837,652 of payments to subcontractors, bringing the total amount of prepayments from $2,373,196 to $4,210,848. *Id.* ¶ 19.

- On October 3, 2018, Attorney Connor emailed King an "updated master mechanics lien affidavit and indemnity for the mortgage modification to be executed by both Dennis Group and Suri." *Id.* ¶ 20.

- On October 4, 2018, Attorney Connor emailed King stating, "[u]nder the terms of the Second Forbearance Agreement we need to follow up with the mechanics lien affidavit." *Id.* ¶ 21.

- On November 9, 2018, Dennis Group was advised by Squatrito that the funds from the Lenders "will have maxed [Debtors'] availability on the construction loan with the banks" after one more draw on the construction funds from the loan. *Id.* ¶ 22.

Despite the frequency and scope of the communications between these parties, Dennis Group waited until July 23, 2020 to notify Lenders of the Debtors' defaults under the Construction Contract. *Id.* ¶ 27. Dennis Group alleges in its Complaint that the Debtors "materially breached the [Construction] Contract in February 2019 due to failure to pay." Compl. ¶ 58. Dennis Group, however, disputes that it continued to perform work on the Project while

knowing it was not being paid. Pl.'s Stmt. ¶ 29. Dennis Group contends it was normal practice to allow clients a generous amount of time to pay contractual expenses. In keeping with that spirit, on August 24, 2018, it amended the Construction Contract to extend the Debtors' deadline to pay invoices to 120 days after the invoice date. *Id*. 29.

### 3.   Material Terms of the Credit Agreement

Although the parties do not dispute any of the material terms of the Consent Agreement, their legal arguments, to a considerable extent, concern the relationship between the Credit Agreement and the Consent.[12]

Section 11.10 of the Credit Agreement states that "this Agreement, the other Loan Documents, and any separate letter agreements . . . constitute the entire contract among the parties." *See* Credit Agreement at 142, ECF No. 223-2; *see also* Section 11.22 at 146. The only signatories to the Credit Agreement are Carla's, Suri, and the Lenders. The Credit Agreement defines "Loan Documents" as including "the Collateral Documents" and "all other certificates, agreements, documents and instruments executed and delivered, in each case, by or on behalf of any Loan Party." *Id.* at 25, "Loan Documents" at (d) and (k). "Collateral Documents" are defined as including, *inter alia*, "the Security Agreement, the Mortgage, and any related Mortgage Property Support Documents." *Id.* at 9. The Mortgage Property Support Documents are "the deliveries and documents described on Schedule 1.1(e)." *Id.* at 27. Schedule 1.1(e) includes "subordinations of mortgages and/or releases of mortgages and other encumbrances of records" and also "[s]uch other documents, instruments, . . . and agreements relating to the Real Estate and/or Mortgaged Property as Administrative Agent [PUB] may request." *See* Schedule 1.1(e)(2) and (16).

---

[12] Although the terms of the Consent are not disputed, the parties have advanced very different interpretations of those terms.

Section 4.4 sets forth the conditions to all credit extensions for construction loans. Section 4.4(l) provides, as a condition, that "[i]f required by [PUB] (in its sole discretion), [PUB] shall have received an executed Project Document Consent from each Person party to the applicable Project Document." *Id.* at 78. The "Project Document Consent" is further defined as Exhibit U to the Credit Agreement, which contains the Consent.

### 4. Material Terms of the Consent

The Consent is titled "Form of Consent" and begins with several recitals identifying the parties and summarizing the terms of the Credit Agreement. Consent, ECF No. 175-7. Paragraph E of the Consent plainly states:

> As a material inducement for the Lenders to advance funds [to the Debtors,] [PUB] has required that [Dennis Group] execute and deliver this Consent . . . to [PUB] [and] [Dennis Group] has agreed to execute and deliver this Consent due to the financial benefit of a portion of the Loan proceeds being intended to satisfy Suri's obligations to [Dennis Group] under the Contract.

*Id.* at 1. The term "Contract" is defined as the Construction Contract between Dennis Group and Suri. *Id.*

Following the recitals are twelve paragraphs containing representations made by Dennis Group. The introductory clause begins by stating: "NOW THEREFORE, for and in consideration of the above and for other good and valuable consideration, receipt of which is hereby acknowledged, [Dennis Group] represents, warrants and agrees with the [Lenders] as follows . . . ." *Id.* at 2. The subsequent provisions that are relevant to the parties' arguments are found in Sections 5 through 8, and Section 10 of the Consent.

Section 7 addresses subordination of Dennis Group's mechanic's lien and states that "[Dennis Group] hereby expressly subordinates and postpones the payment of (a) all contractual, statutory, mechanic's liens, materialmen's liens and other liens to which [Dennis Group] may be

15

or become entitled to the liens of the [Lenders] with respect to the Collateral . . . ." *Id.* at 3. Each of the Subordination Agreements are signed by Lapinski and attached to the Consent.

The Consent's notice provisions are found in Sections 5, 6, and 10. Section 8 contains a disclaimer of duties to Dennis Group. The parties fundamentally disagree on their interpretation of these Sections.

Section 5 of the Consent sets forth the requirement that Dennis Group give the Lenders written notice of Suri's default under the Construction Contract and provides the Lenders with a right to cure the default under certain conditions. Section 5 states:

> If Suri defaults in making any payment or in performing any other obligation under the Contract, ***[Dennis Group] shall give [PUB] written notice of such default at the time it gives notice of such default to Suri.*** [Dennis Group] shall not terminate the Contract due to a default by Suri PROVIDED THAT [PUB] cures such default within sixty (60) days after receipt by [PUB] of the written notice required by this Section 5, and further PROVIDED THAT (a) if curing such default cannot by its nature be accomplished within such sixty (60) day period, [PUB] shall have such longer period to cure the default as is necessary, so long as [PUB] shall have commenced to cure the default within such sixty (60) day period and shall thereafter diligently prosecute the same to completion and (b) [PUB] shall have no duty or obligation to cure any such default by Suri. No termination, pledge or further assignment of the [Construction] Contract by Suri shall be effective without the prior written consent of [PUB].

*Id*. (bold and italic emphasis added).

Section 6 of the Consent sets forth the requirement that Dennis Group must continue performance on the Lenders' behalf if Lenders give notice to Dennis Group of the Debtors' Event of Default (as defined in the Credit Agreement), subject to certain conditions. It does not include conditions or requirements for when the Lenders must give notice of an Event of Default. Section 6 states:

16

> ***Upon receipt of written notice from [PUB] of an Event of Default*** (as such term is defined in the Credit Agreement), ***[Dennis Group] shall continue performance on [PUB's] behalf under the Contract***, PROVIDED THAT, notwithstanding anything in the Contract or herein to the contrary, (a) no default by Suri under the Contract exists which materially impairs the ability of [Dennis Group] to efficiently perform its work and obligations under the Contract, which default is not cured by [PUB] within the time period set forth in Section 5 above, (b) the Contract has not been terminated pursuant to Section 5 hereof, and (c) [PUB] has provided [Dennis Group] with its written agreement (1) to make all periodic payments and other payments which become due to [Dennis Group] after the date of such agreement in accordance with and subject to the terms of the Contract and (2) to assume all obligations of Suri under the Contract which arise on or before the date of such agreement.

*Id*. (bold and italic emphasis added).

Section 8 of the Consent expressly provides that the Lenders are only obligated to the

Debtors and *not* to Dennis Group. Section 8 states:

> Except as provided herein, nothing herein shall be construed to impose upon [PUB] any duty to see to the application of the proceeds of the Loan. ***[Dennis Group] acknowledges that [PUB] is obligated only to [the Debtors] and to no other person or entity. The rights of [PUB] hereunder are for the benefit of [PUB] only, and its successors and assigns, and Suri agrees that it has no rights, entitlement or standing to require or enforce any such limiting condition against [Dennis Group]. [Dennis Group] is executing this Consent to induce [PUB] to advance funds under the Loan Documents, and [Dennis Group] understands that [PUB] would not do so but for [Dennis Group's] execution and delivery of this Consent.*** [Dennis Group] acknowledges that it will obtain substantial financial benefit from the making of the Loan to the [Debtors] and that a portion of the Loan proceeds are intended to be used by Suri to satisfy Suri's obligations under the Contract.

*Id*. (emphasis added).

Section 10 of the Consent contains boilerplate language that provides for the manner and

time in which a party is to give notice to the other party. Section 10 states:

> ***Unless otherwise provided for herein, all notices and communications required or permitted hereunder shall be in***

> ***writing and shall be deemed to have been duly given (a) when sent, if sent by registered or certified mail (return receipt requested, postage prepaid), (b) when delivered, if delivered personally, or (c) when sent, if sent by overnight mail or overnight courier, in each case to: People's United Bank, National Association, One Financial Plaza, Hartford, Connecticut 06103-2613, Attention: Jamie D. Garcia, Relationship Manager, SVP,*** with a copy (which shall not constitute notice) to: Shipman & Goodwin LLP, One Constitution Plaza, Hartford, Connecticut 06103 Attn: James C. Schulwolf, Esq. All notices sent to the [Debtors] or [Dennis Group] shall be sent to the addresses set out on Page 1 hereof, or to such other address as [Debtors] or [Dennis Group] has informed the other parties in writing or as set forth in the Contract.
>
> Any notice of any kind sent hereunder to any party shall simultaneously be sent to each and every other party hereto. Any notice required hereunder may be waived in writing by the party entitled to receive such notice. Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication within any corporation or firm to the persons designated to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

*Id.* (emphasis added).[13]

The signature page of the Consent contains signature blocks for Suri and Dennis Group only. Lapinski signed the Consent on behalf of Dennis Group, but Suri did not sign the copy of the document presented to the Court by the parties.[14] *Id.*; Pl.'s Stmt. ¶ 10. Notably, there is neither a signature block for the Lenders nor did the Lenders otherwise endorse the Consent. *Id.*

---

[13] The Consent further states in paragraph 9 that the agreement "shall be governed by and construed in accordance with the laws of the State of Connecticut."

[14] It is not clear whether the copy of the Consent provided to the Court is an incomplete copy or a final copy that firmly evidences Suri's lack of a signature. Dennis Group attached a copy of the Consent—unsigned by Suri—to its Complaint, *see* ECF No. 16-2, and later attached the same copy to its Partial MSJ, *see* ECF No. 175-7. The Lenders did not attach a copy of the Consent to their Opposition. Thus, the Court does not have a fully signed copy of the Consent from any of the parties. Regardless, the question of whether Suri signed the Consent is not before this Court. Neither Dennis Group nor the Lenders have raised arguments implicating Suri's signature, or lack thereof, in the Consent. Accordingly, the Court assumes a definitive accord in the Consent, evidenced by the closing of the Credit Agreement, and will not address this consideration further.

## IV.    DISCUSSION

Because the parties' central dispute focuses on the interpretation of the Consent, the Court will first address Dennis Group's partial summary judgment motion.

### A.  Dennis Group's Partial Motion for Summary Judgment

#### 1.   Count Seven: Breach of the Consent

Under Connecticut law, to prevail on a claim for breach of contract, the plaintiff must show: (1) the formation of an agreement with the defendant; (2) that the plaintiff performed its obligations under the agreement; (3) that the defendant failed to perform its obligations under the agreement; and (4) as a result, the plaintiff suffered damages. *O'Donnell v. AXA Equitable Life Ins. Co.*, 210 Conn. App. 662, 680 (2022); *see also* Connecticut Civil Jury Instructions § 4.1-15 Breach of Contract (citing *Keller v. Beckenstein*, 117 Conn. App. 550, 558, *cert. denied*, 294 Conn. 913 (2009).

Commercial transactions often rely on a variety of written legal instruments—such as mortgage deeds, guarantees, releases, mechanic's lien waivers, and subordination agreements—that are intrinsically part of the overall transaction, but are nevertheless separate from the core contractual agreements establishing the rights and liabilities of the parties to those contracts. Black's Law Dictionary defines an "instrument" as "[a] written legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate." Black's Law Dictionary (11th ed. 2019). This broad definition encompasses documents that may be bilateral or unilateral contracts, as well as documents that fit neither category. Whether a legal instrument constitutes a binding, enforceable contract between two parties depends on the interpretation of its terms and the parties' intent. *See* 1 Williston on

Contracts § 1:17 (4th ed.) ("[T]he term unilateral contract should be reserved for cases in which a legal obligation has been created, but only one party to the obligation has made a promise. When there is no obligation, the transaction may be a unilateral promise or a unilateral offer, but it cannot properly be called a unilateral contract."); *Data Gen. Corp. v. Citizens Nat'l Bank*, 502 F. Supp. 776 (D. Conn. 1980) (analyzing a letter of credit as a non-contractual legal instrument, as well as both a bilateral and unilateral contract).

Dennis Group argues that it is entitled to partial summary judgment in its favor on the first three elements of its claim for breach of contract. As to the first element requiring formation of an agreement, Dennis Group argues that the plain language of the Consent reflects a bilateral agreement between the Lenders and Dennis Group wherein the Lenders agreed to give notice of the Debtors' default under the Credit Agreement to Dennis Group, and Dennis Group agreed to give notice of Suri's default under the Construction Contract to the Lenders. Dennis Group provides a strained textual analysis of the Consent in support of this argument. It further argues that the Lenders' drafting and approval of the Consent's terms and their signature on the Credit Agreement serves as a substitution for the Lenders' lack of a signature on the Consent. As to the second element requiring performance by the plaintiff, Dennis Group simply claims, without explanation, that "there is no real dispute that Dennis Group performed under the Consent." Pl.'s Mem. at 5. As to the third element requiring performance by the defendant, Dennis Group argues that the Lenders have conceded they never gave notice of the Debtors' default to Dennis Group and there is no genuine dispute of material fact on this issue.

In response, the Lenders argue that Dennis Group's breach of contract claim must fail as a matter of law because Dennis Group cannot establish that the Lenders were parties to the Consent or that they otherwise expressed the requisite intent to be bound by the Consent and,

thus, the Consent does not bind the Lenders to Dennis Group in any way. The Lenders assert that their lack of a signature on the Consent confirms this conclusion and their signature on the Credit Agreement does not translate into a binding obligation under the Consent itself because Dennis Group is not a party to the Credit Agreement. The Lenders further contend that the Consent is not a bilateral contract but merely a legal instrument that is an ancillary component of the Credit Agreement, and that Dennis Group undeniably is not a party to the Credit Agreement. Finally, Lenders argue that Dennis Group willingly subordinated its mechanic's lien under the Consent, and the Consent clearly acknowledges that the Lenders are only obligated to the Debtors and not to Dennis Group.[15]

Even if they are somehow otherwise bound by the Consent, the Lenders argue that they had no duty to provide notice of default to Dennis Group because the plain language of the Consent lacks any obligation for them to do so. Lenders further argue that Dennis Group, as a sophisticated and experienced business enterprise that reviewed and revised the Consent before executing it, should be bound by its terms. Lenders assert that at no point did Dennis Group request any revisions imposing a mandatory notice obligation on the Lenders and that, if they wanted such a provision, they should have asked for it.

The Court agrees with the Lenders and begins its analysis with the issue of whether Dennis Group and the Lenders formed an agreement.

---

[15] While Dennis Group agreed to subordinate its mechanic's lien under the Consent, it also voluntarily subordinated its lien twice under the Subordination Agreements. Further, Section 6 of the Consent qualifies when and if PUB becomes a party to the Construction Contract. *See* Consent, Sec. 6 ("[Dennis Group] shall continue performance on [PUB's] behalf under the Contract . . . PROVIDED THAT . . . (c) [PUB] has provided [Dennis Group] with its written agreement . . . (2) to assume all obligations of Suri under the Contract which arise on or before the date of such agreement.").

### i.    Whether Lenders Are Parties to the Consent

In tandem with the requirements for asserting a breach of contract claim, there exists "a general principle so fundamental that it rarely receives mention in case law or commentary, namely, that only parties to contracts are liable for their breach." *FCM Group, Inc. v. Miller*, 300 Conn. 774, 797 (2011). "In other words, a person who is not a party to a contract (i.e., is not named in the contract and has not executed it) is not bound by its terms."[16] *Id.* (internal quotation marks and brackets omitted); *see also Green v. XPO Last Mile, Inc.*, 504 F. Supp. 3d 60, 65 (D. Conn. 2020), *motion to certify appeal denied*, No. 3:19-CV-01896 (JAM), 2021 WL 1381326 (D. Conn. Apr. 12, 2021) (applying Connecticut contract law to issue of whether parties formed agreement to arbitrate and finding that individual plaintiffs were not parties, despite being signatories, because they signed in a representative capacity as agents on behalf of limited liability companies). The Connecticut Supreme Court recently reiterated this rule and further held that "while a contract may provide benefits to a third party, it cannot burden a third party that is a stranger to it." *Centerplan Constr. Co., LLC v. City of Hartford*, 343 Conn. 368, 411–12 (2022).

It is undisputed that the Consent does not contain a signature block for the Lenders, the Lenders did not otherwise endorse the Consent, and Dennis Group did not otherwise ask the Lenders to sign it. The text within the four corners of the Consent clearly shows that the only two signature blocks are reserved solely for Dennis Group and Suri. Those facts alone are a patently

---

[16] There are some situations where a non-party (or nonsignatory) may still be bound by certain provisions in a contract, in part or in whole, such as those containing arbitration, choice-of-law, and forum selection clauses, but those situations often involve consideration of other applicable non-contract law, such as federal or state arbitration statutes, as well as policy considerations inapposite to this case. *See, e.g. Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (the Second Circuit recognizes five theories for binding non-signatories or non-parties to arbitration agreements); *BNY AIS Nominees Ltd. v. Quan*, 609 F. Supp. 2d 269, 275 (D. Conn. 2009) (non-party may invoke contractual forum selection clause if non-party is "closely related" to one of the signatories such that non-party's enforcement of the clause is foreseeable by virtue of relationship between signatory and party sought to be bound); *see also* Part (A)(1)(ii) (distinguishing the arbitration cases relied on by Dennis Group).

clear indication that the Lenders are not a party to the Consent and did not intend to become one. Although it is undisputed that the Lenders' counsel drafted the Consent, and that agreement expressly names PUB as the Administrative Agent throughout the document, neither of those facts make the Lenders parties to that agreement, nor should they as a matter of fundamental contract law.[17]

Despite this, Dennis Group argues that the Lenders' signature on the Credit Agreement somehow suffices to make them parties to Consent because the Credit Agreement requires execution of the Consent as one of the defined loan documents to the overall transaction. Pl.'s Mem. at 7–8. In other words, Dennis Group argues that the Court should consider the Consent and Credit Agreement as a single contract. In support, Dennis Group cites to *566 New Park Assocs. v. Blardo*, 97 Conn. App. 803 (2006) and *Woodruff v. Butler*, 75 Conn. 679 (1903).

The Court is not persuaded by this argument. Nowhere in the Credit Agreement does this contention find substantive support. Dennis Group has not shown that this Court can interpret the Consent and Credit Agreement as a single contract such that the Lenders are somehow bound to Dennis Group by the Consent. Even if the Court did interpret these documents as a single contract, Dennis Group is not a party to the Credit Agreement and has not provided this Court with any undisputed facts that might otherwise make it a party to that agreement. The inapposite legal authority relied on by Dennis Group and discussed below does not change this conclusion.

In *566 New Park*, the Connecticut Appellate Court addressed incorporation of an unsigned document by reference under circumstances where all relevant parties were signatories to the contract. *566 New Park*, 97 Conn. App. at 725–26. That is not the case here, as Dennis

---

[17] The Court notes that Dennis Group does not argue the existence of a verbal contract; its entire argument is premised on the terms of the Consent. The undisputed facts show that Dennis Group and Lenders never communicated with each other concerning the terms of the Consent.

Group is not a signatory to the Credit Agreement and the Lenders are not signatories to the Consent. Likewise, in the *Woodruff* case, the Connecticut Supreme Court observed that the defendant failed to sign a lease that fell under the statute of frauds. *Woodruff*, 75 Conn. at 679. The Supreme Court found that the defendant was bound by the lease because he signed a letter stating the lease was "all right," which showed his manifestation of assent to the terms of the lease. *Id. Woodruff* is not analogous to the present case as it does not address a complex lending transaction with more than two relevant parties. Moreover, unlike the defendant's letter in *Woodruff*, there is no separate manifestation of assent here to bind the Lenders, as discussed more fully below. In fact, the Consent manifests the opposite of assent. For these reasons, the legal authorities cited by Dennis Group do not support the conclusion that the Lenders' signature on the Credit Agreement binds them to the Consent.

It is true that the Credit Agreement incorporates the Consent as one of the loan documents and states that "taken together" these documents "shall constitute a single contract" as between the Debtor and the Lenders. *See* Credit Agreement § 11.10. However, that language does not reference Dennis Group and therefore does not convert the Consent into a binding contract between Dennis Group and the Lenders without some additional, unequivocal manifestation of assent by the Lenders. Accordingly, the Court concludes that the Lenders are not parties to the Consent.

### ii.    Whether Lenders Otherwise Expressed Intent to be Bound

Despite the Lenders being nonsignatories to the Consent, Dennis Group argues that the Lenders have otherwise expressed intent to be bound to Dennis Group under the Consent in three ways: (1) by drafting and approving the Consent's language; (2) by accepting the benefits of the Consent, which include subordination of Dennis Group's mechanic's lien and the ability to loan

funds to the Debtors; and (3) by suing to enforce the subordination. Pl.'s Reply at 3. In support

of this argument, Dennis Group relies on *Schwarzschild v. Martin*, 191 Conn. 316, 321–22

(1983), as well as *Al Dente, LLC v. Consiglio*, No. NNHCV146049694S, 2015 WL 5315524, at

*4 (Conn. Super. Ct. Aug. 10, 2015), *aff'd*, 171 Conn. App. 576 (2017), and *Data Gen. Corp. v.

Citizens Nat'l Bank*, 502 F. Supp. 776, 785 (D. Conn. 1980). Each of these arguments defies

common understanding and interpretation of contract law in connection with complex

construction and lending transactions.

In *Schwarzschild*, the plaintiff sued to enforce an arbitration award finding the defendants

jointly and severally liable for defaulting on a promissory note. *Schwarzschild*, 191 Conn. at

319–20. The arbitration clause at issue was contained in an addendum to the promissory note. *Id.*

at 318. The addendum was signed by all three defendants, but not by the plaintiff. *Id.* at 318. The

defendants petitioned the court for arbitration and participated in the arbitration proceedings, but

subsequently argued the arbitration clause was not binding without the plaintiff's signature. *Id.* at

320. The Connecticut Supreme Court described the defendants' argument as "incongruous"

because the defendants had clearly manifested their assent to the arbitration clause by signing the

addendum and initiating the arbitration proceedings. *Id.* at 322.

Dennis Group relies on the following proposition in *Schwarzschild*: "[i]n the absence of a

statute requiring a signature . . . parties may become bound by the terms of a contract, even

though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of

benefits under the contract." *Id.* at 321–22. In arguing that the Lenders must take the burdens

with the benefits of the Consent, Dennis Group also points to the following language from that

case: "[o]ne enjoying rights is estopped from repudiating dependent obligations which he has

assumed; parties cannot accept benefits under a contract fairly made and at the same time question its validity."[18] *Id.* at 321.

First, Dennis Group advances an argument that the Consent "burdened" the Lenders by requiring them to give notice to Dennis Group of the Debtors' default. As the Court will explain, the Consent contained no such requirement. *See infra* Part (A)(1)(iii). Second, the *Schwarzschild* case does not stand for the general proposition that a nonsignatory will be bound by all of the terms of a contract simply by benefitting from that contract or suing to enforce that contract. The *Schwarzschild* case exclusively addressed the enforcement of an arbitration clause, which is a distinct contractual covenant that defines and limits a party's rights and options to bring suit under that contract. Arbitration clauses are generally favored as a matter of public policy. *See, e.g., State v. AFSCME, Council 4, Loc. 387, AFL-CIO*, 252 Conn. 467, 473 (2000) (collecting cases) ("We have consistently stated that arbitration is the favored means of settling differences and arbitration awards are generally upheld unless an award clearly falls within the proscriptions of § 52-418 of the General Statutes."). The Consent, however, does not contain an arbitration clause nor is that type of clause even remotely related to the parties' arguments in this case. The Court's policy in favor of arbitration therefore does not apply to this case, despite Dennis Group's bald contention otherwise.[19] As such, *Schwarzschild* cannot bear the weight of the general proposition that Dennis Group seeks to impose on it.

The *Al Dente* and *Data Gen. Corp.* cases relied on by Dennis Group do not address arbitration agreements, but are likewise inapposite to the issue of whether the Lenders, as a nonsignatory, manifested assent to the terms of the Consent. The *Al Dente* case addresses the

---

[18] Dennis Group has not adduced facts to support the conclusion that the Lenders otherwise assumed the obligations under the Construction Contract.
[19] As such, all cases addressing enforcement of arbitration clauses that Dennis Group relies on throughout its briefs are likewise inapposite here.

validity of a contract executed on behalf of a limited liability company prior to its formation. *Al Dente*, 2015 WL 5315524 at *12. Dennis Group cites to the portion of *Al Dente* addressing an unformed entity's *de facto* standing to enforce a contract made on its behalf. *See id.*

The *Data Gen. Corp.* case addresses an intended third party beneficiary's standing to enforce a letter of credit related to a separate contract for the sale of computer equipment. *See Data Gen. Corp.*, 502 F. Supp. at 782–87. More particularly, this case addresses whether a contract existed between the beneficiary and the issuing bank. The case stands, in part, for the proposition that no express assent or formal acceptance is required by the third-party beneficiary to enforce a contract; it is sufficient that the beneficiary knows of the contract and accepts it when he or she begins an action to enforce it. *See id.* at 785. The court's conclusion in *Data Gen. Corp.*, however, rests on a refusal to read into the letter of credit conditions which burdened the beneficiary and over which the beneficiary had no control. *Id.* at 785–89. Although the *Al Dente* and *Data Gen. Corp.* cases generally address circumstances where a non-party sued on a contract, they in no way stand for the general proposition that the very act of bringing suit on a legal instrument binds the non-party to all of the terms under the contract.

Dennis Group has not raised additional legal authorities to support its contention that the Lenders are bound by the Consent by simply drafting or approving its language or by merely enjoying the benefit of Dennis Group's promise to subordinate its mechanic's lien and debt. The converse of those propositions is so well established that it is not the subject of any bona fide legal argument. The Court, therefore, is not persuaded by these unsupported pronouncements.

The Lenders respond that the plain language in Section 8 of the Consent, which states that Lenders are "obligated only to [the Debtors] and to no other person or entity," precludes a finding that they gave an expression of assent. *See* Consent at 3. The Lenders cite the recent case

of *Centerplan Const. Co., LLC v. City of Hartford*, 343 Conn. 368 (2022) as controlling authority on the issue of whether the Lenders manifested binding assent. Defs.' Reply at 7, ECF No. 301.

The *Centerplan* case involved a dispute concerning delays in the construction of Dunkin Donuts Park, a new stadium for Hartford's minor league baseball team, the Yard Goats. *Centerplan*, 343 Conn. at 372. The city entered into an agreement with DoNo (the developer) to which Centerplan (the builder) was not a party. *Id.* at 374. DoNo entered into a separate agreement (the "Design-Build Agreement") with Centerplan to which the city was not a party. *Id.* All three parties—the city, DoNo, and Centerplan—also entered into a third, collective agreement. *Id.* After the city and the baseball team made changes that increased the scope and cost of the project, a dispute arose over which party had control over the architect and its design of the stadium. *Id.* Because DoNo was allowed additional time and money to complete the project, Centerplan submitted a claim to DoNo and DoNo submitted a claim to the city requesting a budget increase. *Id.* at 375. DoNo and the city executed a term sheet to resolve its claim. *Id.* The term sheet gave DoNo and Centerplan more time to complete the project, but it also purported to waive some of Centerplan's claims and potentially eliminated Centerplan's rights under the Design-Build Agreement to get notice of default and a chance to cure. *Id.* Centerplan was not a party to the term sheet, the term sheet had no signature line for Centerplan, and Centerplan did not otherwise sign the term sheet. *Id.* The question in that case was whether Centerplan had nevertheless ratified the term sheet and was therefore bound by its terms. *Id.* at 420.

The Connecticut Supreme Court disagreed with the trial court's interpretation that "the term sheet's silence regarding notice and the opportunity to cure" granted the city a "new and unqualified right to terminate Centerplan and, thus, the notice and cure provision in the Builder

28

Agreement did not control." *Id.* at 411–12. The Supreme Court held that "[i]t is axiomatic that, for the city to gain a new right over Centerplan, Centerplan had to be a party to the term sheet because, while a contract may provide benefits to a third party, it cannot burden a third party that is a stranger to it."[20] *Id.* The Court further held that Centerplan could only be bound by the term sheet if it ratified it given that Centerplan was a nonsignatory. *Id.* The Connecticut Supreme Court remanded the case for another trial because the trial court did not find subordinate facts sufficient to reach a conclusion on the issue of ratification, which was a question of fact for the jury to decide. *Id.* at 423.[21] Thus, *Centerplan* provides that a nonparty is not bound by a contract unless they ratify it, but stops short of determining the various ways in which a nonparty can ratify a contract.

Here, the Court can easily resolve the question of the Lenders' manifestation of assent based on the undisputed facts. It is undisputed that the Dennis Group and the Lenders never communicated with each other either before, during, or after execution of the Consent. *See* Defs.' Stmt. ¶¶ 30–32. There is no evidence in the record, nor has any party made a contention, that the Lenders expressly assumed the Construction Contract. The record simply fails to substantiate some other contrary, definitive, and enforceable assent. Accordingly, the undisputed facts demonstrate that the Lenders did not otherwise express intent to be bound by the Consent.

---

[20] In making this pronouncement, the Court cited to *Joseph General Contracting, Inc. v. Couto*, 317 Conn. 565, 578 (2015), wherein the Court held that "[p]arties to a contract cannot thereby impose any liability on one who, under its terms, is a stranger to the contract, and, in any event, in order to bind a third person contractually, an expression of assent by such person is necessary" (internal quotation marks omitted).

[21] The Connecticut Supreme Court also found that the term sheet was ambiguous as to whether it eliminated Centerplan's notice and cure rights under the Builder Agreement and remanded the case for further factual findings on this issue. *Centerplan*, 343 Conn. at 403. In this case, by contrast, the terms of the Consent are clear, definitive, and unambiguous. *See infra* Part (A)(1)(iii).

### iii.    Whether the Consent Requires Lenders to Give Notice to Dennis Group

Dennis Group also argues that it is entitled to summary judgment on the third element of its claim for breach of contract because the Lenders allegedly breached their duty to perform under the Consent by failing to give notice to Dennis Group of the Debtors' defaults under the Credit Agreement. To find in favor of Dennis Group on this element requires that there be a predicate contractual duty requiring the Lenders to perform. Connecticut courts repeatedly have held that the existence of a contract between the parties is a necessary antecedent to any claim of a breach of duty. *See, e.g., Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 638 (2002) (quoting *Hoskins v. Titan Value Equities Group, Inc.*, 252 Conn. 789, 793 (2000); *Carford v. Empire Fire & Marine Ins. Co.*, 94 Conn. App. 41, 45–46 (2006). Because the Lenders are not parties to the Consent, they never formed an agreement with Dennis Group and therefore never had a duty obligating them to perform. Even if the Lenders were parties to the Consent, however, the plain language of that agreement unmistakably establishes that the Lenders made no promises to give notice to Dennis Group.

Contract interpretation is generally a question of state law to which federal courts defer. *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 468 (2015) (citing *Volt Information Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 498 U.S. 468, 474 (1989). Because Section 9 of the Consent provides that Connecticut law governs interpretation of its terms, the Court will apply the laws of this State.

The Court's interpretation of the Consent is guided by well-established principles of contract interpretation under Connecticut law.

> The intent of the parties as expressed in a contract is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction . . . .

> [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract . . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms.

*Honulik v. Town of Greenwich*, 293 Conn. 698, 710 (2009). "When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact . . . . [When] there is definitive contract language, [however] the determination of what the parties intended by their contractual commitments is a question of law." *Gold v. Rowland*, 325 Conn. 146, 157–58 (2017); *see also Pero Building Co. v. Smith*, 6 Conn. App. 180, 184 (1986) (evaluating a mechanic's lien waiver as matter of law because of clear contract terms).

"The mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Poole v. City of Waterbury*, 266 Conn. 68, 88 (2003) (quoting *United Illuminating Co. v. Wisvest-Connecticut, LLC*, 259 Conn. 665, 670 (2002)). "If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous . . . . By contrast, language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *Id*. (quotation marks and citations omitted).

"[I]n construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous." *Honulik*, 293 Conn. at 711 (quoting *Ramirez Health Net of the Northeast, Inc.*, 285 Conn. 1, 14 (2008). "The contract must be viewed in its entirety, with each

31

provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." *Murtha v. City of Hartford*, 303 Conn. 1, 9 (2011) (citation omitted).

Although there is no definitive test "by which to determine whether contract language is sufficiently definite to warrant its review as a question of law rather than as a question of fact," the majority of cases that have considered this issue involved "a commercial contract between sophisticated commercial parties with relatively equal bargaining power." *Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 496 (2000) (citing *Bank of Boston Connecticut v. Schlesinger*, 220 Conn. 152, 159 (1991)). It is well established that the same rules of interpretation that apply to contracts also apply to other written instruments such as mortgage deeds and restrictive covenants. *Abel v. Johnson*, 340 Conn. 240, 255 (2021); *Bank of New York Mellon v. Madison*, 203 Conn. App. 8, 24 (2021).

In the present case, the undisputed facts show that the Consent is commercial in nature and was made by and between sophisticated and experienced commercial parties. The undisputed facts show that counsel for the Lenders drafted, reviewed, and approved the Consent. As for Dennis Group, Lapinski's testimony that the Consent was "a fairly standard agreement when a project is being financed through a bank," and his knowledge that the Consent and the two Subordination Agreements would subordinate Dennis Group's mechanic's lien to the Lenders' mortgage at the time he executed those documents, show that Dennis Group was aware of the import and significance of its actions. *See* Defs.' Stmt. ¶¶ 9, 34–35. Lapinski's testimony also shows that the Project for Carla's was not the first time Dennis Group had taken on a project that was being financed through comparable loan documents.

Although Dennis Group did not obtain counsel to review the Consent, it has not argued that the absence of counsel resulted in an unequal bargaining power with the Lenders.

Presumably, Dennis Group has refrained from making this argument because it knew it could have obtained counsel if it wanted to. As an experienced engineering firm, it certainly had the wherewithal and resources to do so. Instead, Dennis Group chose to communicate solely with legal counsel for the Debtors without reaching out to the Lenders or making other efforts to obtain a legal opinion on its respective position during the execution of the Consent and the two Subordination Agreements. *See* Defs.' Stmt. ¶¶ 30–31. The Connecticut Supreme Court has recognized that "[c]ourts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law . . . . Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, it is not within its power to make a new and different agreement; contracts voluntarily and fairly made should be held valid and enforced in the courts." *Tallmadge Bros*., 252 Conn. at 505–06. Thus, on the basis of the undisputed record, this Court can and should treat Dennis Group as a sophisticated, commercial party with equal bargaining power to the Lenders. Accordingly, the interpretation of the Consent is a question of law.

With these principles in mind, the Court turns its attention to the present dispute, namely, whether the Lenders were required to give Dennis Group notice of the Debtors' events of default under the Credit Agreement.

Dennis Group persists in making several arguments that certain provisions in the Consent implicitly or explicitly imposed a notice obligation on the Lenders. Dennis Group contends Sections 5 and 6 create tandem notice requirements where Section 5 creates a notice requirement for Dennis Group and Section 6 creates a notice requirement for the Lenders. Section 6, Dennis Group argues, allows the Lenders to step into Suri's shoes to complete construction following

the Debtors' default under the Credit Agreement provided that the Lenders first give notice of the default to Dennis Group. In addition, Dennis Group argues that Section 10 implies a notice requirement for Lenders by dictating the time and manner in which notice is given. Taking these sections together, Dennis Group argues that this Court would have to ignore canons of contract interpretation and "engage in contractual gymnastics" to find that the Consent lacks a notice requirement for the Lenders and "give them a windfall at Dennis Group's $13.3 million expense." Pl.'s Mem. at 12. These arguments may also be characterized as asserting it would be inherently unfair to impose a notice obligation on Dennis Group, but not on the Lenders. Finally, Dennis Group argues that *Ramirez v. Health Net of the Ne., Inc.*, 938 A.3d 1092 (Conn. 2008) requires the Court to construe ambiguities against the Lenders as the party that drafted the contract.

The Lenders emphasize that Dennis Group unreasonably asks the Court to read additional provisions into the Consent. The Lenders argue the unambiguous language of the Consent leads to only one conclusion: the Consent does not require Lenders to give notice of the Debtors' default to Dennis Group. The Lenders contend that the purpose of the Consent, based on the plain language, is to protect and preserve the Lenders' mortgage lien (1) by having Dennis Group voluntarily agree to subordinate its mechanic's lien; (2) by having Dennis Group provide notice to the Lenders upon Suri's defaults under the Construction Contract; and (3) by the Lenders possibly continuing performance under the Construction Contract in the event they provide notice to Dennis Group of the Debtors' defaults under the Credit Agreement and assume the Construction Contract. The Lenders argue that the plain language in Section 8 makes clear that the purpose of the Consent was for Dennis Group to induce Lenders to lend money to the Debtors. Further, the Lenders argue they did not owe a duty to Dennis Group because they did

not make any promises to Dennis Group, including any promise that the construction funds advanced to the Debtors would in fact be applied to the amount owed to Dennis Group under the Construction Contract.

The Court agrees with the Lenders that the terms of the Consent are unambiguous and clearly do not impose any default notice requirement on the Lenders. Dennis Group's attempt to characterize the Consent's language as ambiguous by reading additional provisions into its terms is disingenuous and unavailing. Even if the Lenders were bound by the Consent, which this Court has already found they are not,[22] the four corners of the document do not contain a requirement that the Lenders must provide notice to Dennis Group of any Debtors' default under the Credit Agreement. Dennis Group's implicit request that the Court rewrite or reform the notice provisions in its favor ignores the recognized and fundamental restraints on this Court's authority and the onus placed on sophisticated parties to protect their respective interests when drafting legal documents.

The Consent states in clear, unambiguous terms that the Lenders are only obligated to the Debtors, not to Dennis Group. Section 8 of the Consent emphatically and plainly states:

> Except as provided herein, ***nothing herein shall be construed to impose upon [PUB] any duty to see to the application of the proceeds of the Loan. [Dennis Group] acknowledges that [PUB] is obligated only to [the Debtors] and to no other person or entity. The rights of [PUB] hereunder are for the benefit of [PUB] only*** . . . and Suri agrees that it has no rights, entitlement or standing to require or enforce any such limiting condition against [Dennis Group]. [Dennis Group] is executing this Consent to induce [Lenders] to advance funds under the Loan Documents, and [Dennis Group] understands that [Lenders] would not do so but for [Dennis Group's] execution and delivery of this Consent. [Dennis Group] acknowledges that it will obtain substantial financial benefit from the making of the Loan to the [Debtors] and that a portion of the

---

[22] *See* Part (A)(1)(i) and (ii) (concluding that the Lenders are not a party to the Consent and did not otherwise manifest assent to be bound by the Consent).

> Loan proceeds are intended to be used by Suri to satisfy Suri's obligations under the [Construction] Contract.

Consent at 3 (emphasis added). This clause does not manifest any intention by Lenders to be bound to Dennis Group in any way, shape, or form.

The clear, definitive, and unambiguous language in Section 8 of the Consent confirms that the Lenders did not make a promise or owe a duty to Dennis Group.[23] Dennis Group does not dispute that the Consent was designed to materially induce the Lenders to advance funds to the Debtors under the Credit Agreement. Instead, Dennis Group points to language in the Consent stating that Dennis Group "represents, warrants and agrees with the [Lenders] as follows . . . ." as indicating that it had some mutual agreement with the Lenders. The Court does not deny that this language, in a vacuum, might give a misleading impression. Notwithstanding that, this phrase alone does not create contractual privity; it is simply an affirmation of the Lenders' inducement to make the loan and advance the funds to the Debtors. When this language is compared to the clear edict in Section 8, there is no possible reading of the Consent that results in ambiguity. As the Court will further explain, no other Section of the Consent contains language evidencing a promise of any kind made by the Lenders that might contradict the clear terms of Section 8. *See infra* Part (A)(1)(ii). Although Dennis Group agreed to do several things to induce the Lenders' extension of credit, such as subordinating its mechanic's lien and debt and

---

[23] In its Complaint, Dennis Group asserts the bargained-for exchange under the Consent was Dennis Group's agreement to subordinate its lien in exchange for receipt of payments under the Construction Contract from the funds released through the Credit Agreement. Compl. ¶ 66. In other words, Dennis Group asserts the Consent required the Lenders to pay Dennis Group for its work on the Project from the loan proceeds. The Consent, however, is silent as to how Dennis Group was to be paid for the Project. It is the Construction Contract, to which only Suri and Dennis Group are parties, that governs the terms of payment for the Project; and even in that document, there is no requirement for the Lenders to remit funds to Dennis Group or to otherwise perform. *See* Construction Contract, Sec. 2 ("The Owner Agrees to Pay the Engineer/Construction Manager") and Sec. 11 ("Payments"), ECF No. 175-6.

providing written notice to the Lenders of the Debtors' defaults on the Credit Agreement, the Consent plainly does not contain any reciprocal promises by the Lenders.

Without such a promise, there is no manifestation of any mutual assent sufficient to create a binding and enforceable contract as between Dennis Group and the Lenders. *See Kinity v. US Bancorp*, 212 Conn. App. 791, 825–26 (2022) (explaining how courts determine when parties have manifested mutual assent to the terms of a contract). Rather than a bilateral contract, the Consent is simply a unilateral legal instrument designed to assure Lenders of the priority of their mortgage. Thus, even though the Consent was executed for the Lenders' benefit, the express terms of the Consent show that the Lenders did not intend to make promises to Dennis Group and did not accept or otherwise endorse the Consent. Accordingly, the Lenders were not obligated to Dennis Group under Section 8 of the Consent and, therefore, could not breach a non-existent duty.

The remaining Sections of the Consent do not change this conclusion. Section 6 of the Consent begins by clearly stating that "***[u]pon receipt of written notice from [PUB]*** of an Event of Default . . . [Dennis Group] shall continue performance on [PUB's] behalf under the Contract . . . .*" (emphasis added). Dennis Group contends that this phrase "presupposes that PUB must give Dennis Group notice." Pl.'s Mem. in Supp. of Partial MSJ at 9, ECF No. 175-1. Lenders, on the other hand, contend this phrase should be interpreted as a "discretionary obligation" to provide notice, not a mandatory one. In other words, within the ambit of that clause resides nothing but the Lenders' discretion.

Lenders correctly point out the absence of any contrary language requiring them to provide notice of the Debtors' default to Dennis Group. A comparison with the language in Section 5 makes this even clearer. Section 5 imposes a notice obligation on Dennis Group and

states "[i]f Suri defaults in making any payment or in performing any other obligation under the Contract, *[Dennis Group] shall give [PUB] written notice of such default* at the time it gives notice of such default to Suri." Consent at 3 (emphasis added). The use of the word "shall" shows in unambiguous terms that Dennis Group was required to provide notice to the Lenders of Suri's default on the Construction Contract. The same cannot be said for the Lenders purported undertaking under Section 6. The unambiguous language in Section 6 is susceptible to but one interpretation: that the Lenders had a discretionary, not mandatory, right and prerogative to provide notice to Dennis Group. When Section 6 is read as a whole, it simply gives Lenders the *option* to force Dennis Group to continue work on the Project if the Debtors default on their loan and the Lenders choose to assume the Construction Contract. It does not require the Lenders to exercise the option or to provide notice related to other matters. In this Court's experience and common sense, such an option is consistent with commercial custom and practice in a construction loan context.

Undeterred, Dennis Group further argues that Section 10 also contains a notice requirement for the Lenders. The Lenders contend that Section 10 is a boilerplate notice provision that merely identifies the manner and place of service to which notice must be given and that none of the language in that section imposes any duty on Lenders to provide notice to Dennis Group of any default. The Court emphatically agrees. The fact that Section 10 contains an address for Dennis Group does not result in a mandatory notice obligation for the Lenders. The language in this Section is a standard, boilerplate contract provision that does not convert the Lenders' discretionary notice option in Section 6 into a mandatory obligation. Moreover, Section 10 references notices that are "either required or permitted." *See* Consent, Section 10 ("[A]ll notices required *or permitted* hereunder shall be in writing.").

38

Dennis Group's interpretation of the Consent unreasonably seeks to read additional, non-existent provisions into the document that go far beyond reasonable commercial expectations, drafting conventions, and the construction of the plain language of the Consent. The express terms of the Consent, when read separately—and even when taken together as a whole—do not create ambiguity or otherwise impose any obligation upon Lenders to notify Dennis Group of the Debtors' default under the Credit Agreement. If that is what Dennis Group desired, it should have negotiated for those rights and obligations; it did not, and it is well outside the province of this Court to do so now. Accordingly, the Court again concludes that the unambiguous language of the Consent clearly establishes that the Lenders were under no duty to provide notice to Dennis Group.

The Court is cognizant of the ramifications of its decision and is sympathetic to the financial weight of Dennis Group's situation. Without a claim for breach of contract, Dennis Group's voluntary subordination of its mechanic's lien to the Lenders' mortgage likely puts it in the position that it will be paid mere pennies on the dollar, if anything, for the millions in construction costs it incurred.[24] Its hopes and notions of fairness and its ostensible goodwill to complete the Project, however, are not sufficient to transform unequivocal, plainly drafted covenants into new rights and obligations that were never undertaken by the Lenders.

The Lenders, Debtors, and Dennis Group are sophisticated commercial parties with refined experience and knowledge, access to legal counsel, and a familiarity with negotiating and

---

[24] Practically speaking, the proceeds from the sale of the Properties are insufficient to satisfy both the Lenders' mortgage and Dennis Group's mechanic's lien. The Properties sold for a purchase price of $24,891,123, subject to working capital adjustments at the time of closing. Court's Order Approving Sale, BR-ECF 486, Case No. 21-20111. After payment of closing costs, costs of sale and other authorized disbursements at closing, the remaining cash portion of the purchase price was $22,866,662.58. Ruling on Lenders' Mot. for Relief from Stay at n.2, BR-ECF No. 733, Case No. 21-20111. After payment of any priority administrative claims, this balance will be further reduced. As a secured creditor, the Lenders are entitled to payment of their claim before Dennis Group can receive any portion of the sale proceeds to satisfy its $15,418,497 claim to a surety bond.

performing complex commercial transactions. The parties could have written an agreement that included mandatory notice provisions for the Lenders such that Dennis Group would know when the Debtors' defaulted on the Credit Agreement and might act accordingly to protect its right to payment by stopping construction or taking other preemptive measures to mitigate its risk of exposure to nonpayment, but they did not do so. Even if the Court were to treat this issue as a question of fact, the summary judgment record entirely lacks evidence that might indicate the parties' mutual intent to make any such agreement. It is undisputed that Dennis Group requested certain revisions to the Consent through its discussions with the Debtors and Debtors' counsel, but never requested that the Lenders revise the Consent to include a mandatory notice obligation for the Lenders. Thus, the Court concludes that the parties "meant what they said and said what they meant, in language sufficiently definitive to obviate any need for deference" to any undisputed factual findings as to the parties' intent. *Tallmadge Bros.*, 252 Conn. at 497. Accordingly, Dennis Group's Partial Motion for Summary Judgment as to Count Seven is denied.

### 2. Count Six: Breach of the Duty of Good Faith and Fair Dealing

Dennis Group has also moved for summary judgment on Count Six of its Complaint for the Lenders' breach of the duty of good faith and fair dealing. Dennis Group argues that the Lenders breached their implied duty of good faith under the Consent by failing to give notice of the Debtors' default under the Credit Agreement. *See* Pl.'s Reply at 10, ECF No. 255.

Dennis Group's claim for breach of the duty of good faith and fair dealing must be premised on the existence of a valid, binding contract with the Lenders. "It is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship." *Macomber v. Travelers Prop. & Cas. Corp*., 261 Conn. 620, 638 (2002) (quoting

40

*Hoskins v. Titan Value Equities Group, Inc.*, 252 Conn. 789, 793 (2000). "The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Id.* Thus, "the existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing." *Id.* Because the Lenders are not a party to the Consent and have no duty to give notice of the Debtors' default to Dennis Group, Dennis Group's claim for breach of the duty of good faith and fair dealing cannot succeed as a matter of law.

Dennis Group's arguments to the contrary are again strained and unavailing. Assuming, arguendo, that the Consent imposed a discretionary notice obligation on the Lenders, Dennis Group argues that the Lenders still had to exercise good faith when deciding whether to exercise that discretionary obligation by at least considering whether to give notice when the Debtors defaulted. Partial MSJ at 12–13. Such a construction, however, would obviate the Lenders' bargained for "discretion."

Because the Lenders admitted that they never intended to give notice, Dennis Group further contends that this so-called defiant act constituted a lack of good faith because it deprived Dennis Group of the ability to protect itself by ceasing work on the Project upon receipt of the notice. The sole Connecticut case relied on by Dennis Group is *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 387 (2016). The *Geysen* case involved an at-will employment contract and, thus, its holding is premised on the existence of a valid contract. *See id.* at 387. Unlike *Geysen*, there is no contract in this case between Dennis Group and the Lenders to which the duty of good faith could attach, as the Lenders correctly point out. *See* Lenders' Opp'n at 22–24. "As [Connecticut] case law makes clear, no claim of breach of the duty of good faith and fair

41

dealing will lie for conduct that is outside of a contractual relationship." *Carford v. Empire Fire & Marine Ins. Co.*, 94 Conn. App. 41, 46 (2006) (alteration in original); *see also Macomber*, 261 Conn. at 638.

The only other authority offered by Dennis Group is nonbinding decisional law from jurisdictions outside Connecticut. *See Bank of Am., N.A. v. Rausher*, 43 Misc. 3d 488 (Sup. Ct. 2014) (involving contract between mortgagor and mortgagee); *Comparetto v. Allstate Ins. Co.*, 2012 U.S. Dist. LEXIS 208285 (C.D. Cal. Aug. 22, 2012) (involving employment contract); *Locke v. Warner Bros.*, 57 Cal. App. 4th 354 (1997) (involving contract between movie director and studio). These cases are similarly premised on a valid, binding contract and therefore do not change the Court's conclusion, particularly where the Connecticut Supreme Court has clearly spoken on this very issue.[25] Dennis Group has not provided any additional authority demonstrating that the duty of good faith and fair dealing may be enforced against a non-party. Accordingly, the Court concludes that Dennis Group's Partial Motion for Summary Judgment as to Count Six must be denied.

### 3.    Count Two: Fraud

Dennis Group has also moved for summary judgment on Count Two of its Complaint alleging fraud by the Lenders. "The four essential elements of fraud are (1) that a false representation of fact was made; (2) that the party making the representation knew it to be false; (3) that the representation was made to induce action by the other party; and, (4) that the other party did so act to [its] detriment." *Bank of Am., N.A. v. Aubut*, 167 Conn. App. 347, 378 (2016). Dennis Group moves for summary judgment on the first and second elements, leaving causation and damages for trial.

---

[25] Although non-binding authority cited from other jurisdictions may offer persuasive reasoning under certain circumstances, this is not one of them.

Dennis Group argues that the Lenders made a knowingly false statement in three different ways: (1) by promising to give notice of default under the Consent without a present intent to perform (*i.e.,* promissory fraud); (2) by voluntarily including language in the Consent that created the impression that the Lenders intended to give notice of the Debtors' default, but failing to fully disclose that the Lenders had no such intent (*i.e.,* a half-truth); and (3) by failing to disclose the Debtors' defaults under the Credit Agreement while simultaneously requesting that Dennis Group subordinate its mechanic's lien to the Lenders' mortgage (*i.e.,* an omission).

The Lenders argue that Dennis Group cannot show that the Lenders made a false promise, represented a half-truth, or made any material omissions because Dennis Group's arguments are premised, yet again, on the assumption that the Consent required the Lenders to give notice of default to Dennis Group; this Court has already determined it does not. Further, the Lenders contend that "the misinterpretation of a provision in a contract that a sophisticated business entity reviewed and revised before executing cannot constitute fraud." Opp'n at 25.

The Court agrees with the Lenders that Dennis Group's fraud claim likewise must fail. The only identifiable "misrepresentations" alleged in Count Two of the Complaint relate to the notice provisions in the Consent, which do not require the Lenders to give notice of default to Dennis Group. The factual record on summary judgment does not contain any other alleged misrepresentations or omissions for this Court to consider, especially when the parties agree there were no communications or negotiations of any kind between Dennis Group and the Lenders either before, during, or after Dennis Group's execution of the Consent. Thus, Dennis Group's fraud claim is fatally flawed for lack of any false representations, omissions, or half-truths. Further, the Lenders' inclusion of—and Dennis Group's consent to—a provision in Section 6 of the Consent giving the Lenders the *option* to force Dennis Group to continue work

on the Project if the Debtors default on their loan is not an assurance of its exercise of that provision nor is the Lenders' expressed intent to never take advantage of that provision a waiver of its prerogative to change its mind. Accordingly, no reasonable jury could find for Dennis Group based on the undisputed facts before this Court and, therefore, this Court concludes that Dennis Group's Partial Motion for Summary Judgment as to Count Two must be denied.

### B.  Lenders' Partial Motion for Summary Judgment

The Lenders have moved for summary judgment on Count One of the Complaint and Count One of its Counterclaim, both of which seek declaratory judgments that are essentially a mirror-image of each other. Count One of the Complaint seeks a declaratory judgment determining that Dennis Group's mechanic's lien is valid and enforceable; that the Consent is unenforceable; and that the Lenders' mortgage is invalid. *See* Compl. ¶¶ 62–79. Count One of the Lenders' Counterclaim seeks a declaratory judgment determining that Dennis Group's mechanic's lien is invalid and unenforceable; that the services and construction work comprising the mechanic's lien are not lienable; that the rights of subcontractors are subordinated to Dennis Group's mechanic's lien; or, alternatively, to the extent the mechanic's lien is valid, that the Subordination Documents are valid and enforceable and that Dennis Group effectively subordinated its mechanic's lien to the Lenders' mortgage. The Lenders' Cross-Motion only seeks partial summary judgment on the portion of these claims that pertain to the validity and enforceability of the Subordination Documents.

As explained more fully below, the undisputed facts warrant a preliminary declaratory judgment in favor of the Lenders stating that the Subordination Documents are presumptively valid, binding, and enforceable against Dennis Group. Dennis Group, however, has advanced arguments in its supplemental briefs that indirectly raise the issue of whether the Court has

44

subject matter jurisdiction over the cause of action underlying this portion of the declaratory judgment claims related to the validity and enforceability of the Subordination Documents. The underlying claim supporting a declaratory judgment in this regard is Count Two of the Lenders' Counterclaim for Dennis Group's breach of the Subordination Documents. The question of the Court's subject matter jurisdiction over that claim focuses on the issue of whether the Lenders possess standing as third-party beneficiaries to bring suit on the Subordination Documents. Accordingly, the Court will first address whether it has subject matter jurisdiction over Count Two of the Lenders' Counterclaim for breach of the Subordination Documents before turning to the question of whether the Lenders have shown that they are entitled to summary judgment on the portion of the declaratory judgment claims related to the validity and enforceability of the Subordination Documents found in Count One of the Complaint and Count One of the Counterclaim.

### 1.    Whether the Lenders Have Standing as Third-Party Beneficiaries

In its Sur-Reply, Dennis Group cites testimony, made over objection, from BMO's corporate representative that BMO considers itself a third-party beneficiary of the Consent. See Pl.'s Sur-Reply at 1–2, ECF No. 289. In light of BMO's assertion, Dennis Group argues that a third-party beneficiary can be bound by a contract by accepting its benefits or suing on the contract, among other things. In other words, Dennis Group now argues that the Lenders can be held liable for breach of the Consent as third-party beneficiaries. It further argues that the Lenders cannot assert a counterclaim for breach of the Consent unless they are parties to the Consent or third-party beneficiaries.[26] *See* ECF No. 306 at 1.

---

[26] The Court notes Dennis Group's apparent contradiction with its prior arguments. Dennis Group's entire Partial MSJ is premised on the assumption that the Lenders are parties to the Consent and contains extensive arguments in that regard. Now, in its supplemental briefs, Dennis Group insinuates that the Lenders are not parties to the Consent and therefore cannot bring suit on the Consent. Dennis Group ventures very close to being judicially estopped from

BMO's characterization of its status as a third-party beneficiary is not relevant to the Court's analysis of subject matter jurisdiction because the question of whether the Lenders are third-party beneficiaries of the Subordination Documents such that they can sue to enforce those agreements is a question of law for this Court to decide. "[W]hether a party has standing, based upon a given set of facts, is a question of law for the court . . . and in this respect the label placed on the allegations by the parties is not controlling." *Dow & Condon, Inc. v. Brookfield Dev. Corp.*, 266 Conn. 572, 579–80 (2003) (quoting *Ganim v. Smith & Wesson Corp.*, 258 Conn. 313, 348 (2001)). The testimony of BMO's corporate representative—that it considers itself a third-party beneficiary of the Consent—is therefore not controlling.

The Court will now address whether it has subject matter jurisdiction over Count Two of the Lenders' Counterclaim for breach of the Subordination Documents, which is the underlying cause of action supporting the portion of the declaratory judgment claims in Count One of the Complaint and Count One of the Counterclaim related to the validity and enforceability of the Subordination Documents.

"[T]he Declaratory Judgment Act does not by itself confer subject matter jurisdiction on the federal courts." *Correspondent Servs. Corp. v. First Equities Corp. of Fla.*, 442 F.3d 767, 769 (2d Cir. 2006) (citing 28 U.S.C. § 2201(a)). "Rather, there must be an independent basis of jurisdiction before a district court may issue a declaratory judgment." *Id.* The issue here is

---

making this argument in the first place but does not cross that line. "Under the doctrine of judicial estoppel '[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, [the party] may not thereafter, simply because [the party's] interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by [the opposing party].'" *Siuzdak v. Sessions*, 295 F. Supp. 3d 77, 111 (D. Conn. 2018) (alteration in original) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). "This rule 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *Id.* (quoting *New Hampshire*, 532 Conn. at 749). "Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." *Id.* (quoting *New Hampshire*, 532 Conn. at 750). Because Dennis Group was not successful on its initial claim that the Lenders are parties to the Consent, the Court will not apply the doctrine of judicial estoppel.

whether this Court has subject matter jurisdiction over the Lenders state law claim asserted in Count Two of its Counterclaim for breach of the Subordination Documents. Dennis Group's arguments on the Lenders' standing to assert to a claim for breach of the Subordination Documents as third-party beneficiaries is a question of this Court's subject matter jurisdiction over that specific claim. *Ferri v. Powell-Ferri*, 326 Conn. 438, 448 (2017) (holding that standing implicates subject matter jurisdiction).

The Court begins with the applicable law for when a third-party beneficiary possesses standing to bring suit in Connecticut courts.[27] "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy . . . . When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury [that he or she has suffered or is likely to suffer]. Similarly, standing exists to attempt to vindicate arguably protected interests." *Wilcox v. Webster Ins., Inc.*, 294 Conn. 206, 214 (2009) (alteration in original).

"Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved . . . . The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming

---

[27] Neither Dennis Group nor the Lenders provide legal authority for when someone becomes a third-party beneficiary to a contract or when that third party possesses standing to bring suit, which are issues of black letter law. Although it is the Lenders' burden to show that they are entitled to judgment as a matter of law on this issue, the Court is satisfied that the Lenders have met their burden through the variety of other arguments made throughout the briefs for both Dennis Group's Partial MSJ and the Lenders' Cross-Motion.

aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action] . . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." *Id.* at 214–15 (alteration in original).

"A third party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract . . . . Therefore, a third party beneficiary who is not a named obligee in a given contract may sue the obligor for breach." *Id.* at 217 (footnote omitted) (quoting *Gateway Co. v. DiNoia*, 232 Conn. 223, 230–31 (1995)). "[T]he ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary] . . . ." *Id.* (alteration in original) (quoting *Wasniewski v. Quick & Reilly, Inc.*, 292 Conn. 98, 109 (2009)). "Although ordinarily the question of contractual intent presents a question of fact for the ultimate fact finder, [when] the language is clear and unambiguous it becomes a question of law for the court." *Id.* (alteration in original).

"The law regarding the creation of contract rights in third parties in Connecticut is equally well settled." *Grigerik v. Sharpe*, 247 Conn. 293, 311 (1998). "The ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary] and . . . that intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and

purposes of the parties." *Id.* at 311–12. In the event the contract does not contain express language, the "intent of both parties to a contract determines whether a third party has contract rights as a third party beneficiary." *Grigerik v. Sharpe*, 247 Conn. 293, 310, 312 (1998).

As this Court has already determined, *see supra* Part (A)(1), the express language in Section 8 manifestly establishes that the Consent was made for the benefit of the Lenders. *See* Consent, Sec. 8 ("[Dennis Group] acknowledges that [PUB] is obligated only to [the Debtors] and to no other person or entity. The rights of [PUB] hereunder are for the benefit of [PUB] only."). It is undisputed that the Lenders derive several direct benefits from the Consent related to Dennis Group's subordination of its mechanic's lien in the Subordination Agreements, namely the ability to loan funds to the Debtors knowing its mortgage and payment would take a first priority position. Further, Dennis Group acknowledges that it understood this to be the precisely intended purpose of the Consent when it signed it. *See* Pl.'s Stmt. ¶ 12. Accordingly, this Court finds that the Lenders are intended third-party beneficiaries under the Subordination Documents and therefore have standing to bring a claim for breach of those agreements. *See Wilcox*, 294 Conn. at 217.[28]

Dennis Group points to several cases that it claims support the conclusion that the Lenders are bound by the Consent as third-party beneficiaries. The sole Connecticut case relied on by Dennis Group, <u>Armetta v. Corvo</u>, No. X04HHDCV136046616S, 2015 Conn. Super. LEXIS 2083, at *8 (Super. Ct. Aug. 11, 2015), addresses whether a third party or nonsignatory to a contract is bound by an arbitration clause under principles of contract law and equitable

---

[28] The Lenders also argue that they are entitled to enforce the Subordination Documents against Dennis Group because they are in privity of estate with each other. Defs.' Response at 9–10, ECF No. 301. Other than a citation to Black's Law Dictionary, the Lenders do not put forth any authority in support of this contention. Regardless, the Court does not need to reach this issue because it has already determined that the Lenders indisputably possess standing to enforce the Subordination Documents as third-party beneficiaries.

estoppel. Dennis Group's remaining authority is from outside Connecticut, which includes a Delaware and Tennessee case that address whether a third party can be compelled to arbitrate if the subject contract contains an arbitration clause. *See NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 431 (Del. Ch. 2007) (indirect owner of limited liability company was not required to arbitrate its claims under arbitration clause contained in limited liability company agreement); *Harvey ex rel. Gladden v. Cumberland Tr. & Inv. Co.*, 532 S.W.3d 243, 265 (Tenn. 2017) (non-signatory beneficiaries are only compelled to arbitrate where their claims seek to enforce the contract at issue). As this Court has already determined, *see supra* Part (A)(1)(ii), cases addressing the enforceability of arbitration clauses are wholly inapposite to this case.

Dennis Group's remaining cases generally address third-party contractual liability but are from other jurisdictions. *See Res. Title Agency, Inc. v. Morreale Real Est. Servs., Inc.*, 314 F. Supp. 2d 763, 770 (N.D. Ohio 2004) (surveying limited amount of Ohio law on third-party contractual liability and declining to reach general proposition on that issue); *Peter's Clothiers, Inc. v. Nat'l Guardian Sec. Servs. Corp.*, 994 F. Supp. 1343, 1347 (D. Kan. 1998) (third-party beneficiary could not recover damages greater than contract allowed). Dennis Group seemingly overlooks express language in the Consent that its terms "shall be governed by and construed in accordance with the laws of the State of Connecticut." Consent at 3. As such, nonbinding authority from outside Connecticut, while instructive, is not applicable here to the question of whether the Lenders are third-party beneficiaries to the Consent.

Accordingly, the Court finds that the Lenders possess standing as third-party beneficiaries to pursue a claim for breach of the Subordination Documents and, therefore, the Court has subject matter jurisdiction over Count Two of the Lenders' Counterclaim, which is the

relevant cause of action underlying the portion of the declaratory judgment claims in Count One of the Complaint and Count One of the Counterclaim.

### 2.    Count One: Declaratory Judgment

The Lenders have moved for partial summary judgment on Count One of their Counterclaim, but only regarding the portion of that claim that seeks a declaratory judgment stating that Dennis Group's subordination of its mechanic's lien under the Subordination Documents is *valid*. The Lenders have also moved for summary judgment on Count One of the Complaint, but only regarding the portion of that claim that seeks a declaratory judgment stating that Dennis Group's subordination of its mechanic's lien under the Subordination Documents is *invalid*. As previously stated, the competing declaratory judgment claims address a variety of other issues that are not the subject of the Motions before this Court, one of which is the timeliness and validity of Dennis Group's mechanic's lien. The timeliness and validity of the mechanic's lien is the subject of a separate set of cross-motions for summary judgment reserved for further decision in this Court's Second Summary Judgment Ruling. *See* ECF Nos. 215 and 268–70.

Bankruptcy courts may issue declaratory judgments pursuant to Rule 7001(9) of the Federal Rules of Bankruptcy Procedure. Rule 7001(9) provides that adversary proceedings include "a proceeding to obtain a declaratory judgment" relating to any of the prior enumerated circumstances in the Rule. Subsection (2), which is most applicable to this case, includes a "proceeding to determine the validity, priority, or extent of a lien or other interest in property . . . ." Fed. R. Bankr. P. 7001(2). A bankruptcy court's discretion to issue a declaratory judgment is subject to the constraints of the Declaratory Judgment Act and the court's jurisdictional limits as an Article I court. *See In re U.S. Lines, Inc.*, 197 F.3d 631, 639 (2d Cir. 1999).

Importantly, the parties do not dispute the threshold, prima facie validity of the Subordination Agreements or that Dennis Group's subordination of its mechanic's lien was knowing and voluntary.[29] In its Rule 56(a)(2) Statement, Dennis Group admitted that it knowingly subordinated its mechanic's lien and that the subordination was otherwise valid. Pl.'s Stmt. ¶ 12, 14. As such, the Lenders have established that there is no genuine dispute of material fact as to the presumptive validity of the Subordination Agreements and that they would otherwise be entitled to judgment as a matter of law. *See In re Credit Indus. Corp.*, 366 F.2d 402, 408 (2d Cir. 1966) (bankruptcy courts must enforce lawful subordination agreements according to their terms). However, the Court will refrain from entering a final declaratory judgment until after it decides the issues posed by the pending second set of summary judgment motions related to the timeliness, scope and validity of the mechanic's lien. *See e.g., Nat'l Bank of Washington v. Dolgov,* 853 F.2d 57, 58 (2d Cir. 1988) (per curiam) (court should not enter final judgment on fewer than all claims in the case under Fed. R. Civ. P. 54(b) if the same or closely related issues already decided remain to be litigated).

## V.  CONCLUSION

### A.  Dennis Group's Partial Motion for Summary Judgment and Declaratory Relief

Dennis Group has failed to show that it is entitled to judgment as a matter of law on its claim for breach of contract in Count Seven and its breach of the duty of good faith and fair dealing in Count Six of the Complaint. On its breach of contract claim, Dennis Group has failed to show that it formed an agreement with the Lenders under the Consent. The Lenders are not parties to the Consent, nor did they express any intent to be bound by the Consent. The Consent

---

[29] Dennis Group has asserted additional claims in its Complaint that, if successful, could vitiate the validity of the Subordination Documents. Those claims include equitable subordination under 11 U.S.C. § 510(c), violations under CUTPA, tortious interference, and unjust enrichment. None of these claims are currently subject to a motion for summary judgment and, thus, judgment on these claims is accordingly reserved for future proceedings.

creates a bilateral contract between Dennis Group and Suri only. The Consent is simply a legal instrument by those parties intended to favor the Lenders. The Lenders have not made reciprocal promises to Dennis Group of any kind in the Consent that would subject them to contractual liability. Even if the Lenders were somehow parties to the Consent, Dennis Group has failed to show that the Lenders had a duty to provide notice to Dennis Group of the Debtors' defaults under the Credit Agreement. The language of the Consent is plain, clear, and unambiguous— Dennis Group was required to provide notice to the Lenders of Suri's defaults under the Construction Contract, but the Lenders had no obligation to provide notice to Dennis Group of the Debtors' default under the Credit Agreement. On its breach of the duty of good faith and fair dealing claim, Dennis Group has failed to show the existence of a valid, binding, and enforceable contract as a predicate to the existence of those implied duties.

Dennis Group has also failed to show that a reasonable jury could find in favor of Dennis Group on its fraud claim in Count Two of the Complaint. Dennis Group's fraud claim is also premised on the erroneous assumption that the Lenders agreed to provide notice of default to Dennis Group under the Consent. Dennis Group has not shown that the Lenders have otherwise knowingly made a false representation and, thus, a reasonable jury could not find in Dennis Group's favor on the undisputed facts relevant to this claim.

Accordingly, for the reasons stated herein, it is hereby ORDERED, DECREED, and ADJUDGED that:

1.      Dennis Group's Partial Motion for Summary Judgment on Count Seven of its Complaint for breach of contract is DENIED.

2.      Dennis Group's Partial Motion for Summary Judgment on Count Six of its Complaint for breach of the duty of good faith and fair dealing is DENIED.

3.      Dennis Group's Partial Motion for Summary Judgment on Count Two of its Complaint for fraud is DENIED.

**B.  The Lenders' Partial Motion for Summary Judgment and Declaratory Relief**

The Lenders have successfully shown that there are no genuine disputes of material fact and that they are otherwise entitled to judgment as a matter of law on the portion of the declaratory judgment claims pertaining to the validity and enforceability of the Subordination Documents in Count One of the Complaint and Count One of the Counterclaim.

Accordingly, for the reasons stated herein, it is hereby ORDERED, DECREED, and ADJUDGED that:

1.      Notwithstanding Dennis Group's claims in Counts Two, Six, and Seven of the Complaint, and the special defenses it has asserted in avoidance of the subordination of its mechanic's lien, the Lenders' Partial Cross-Motion for Summary Judgment on Count One of its Counterclaim for a declaratory judgment is GRANTED in part, but only as to the presumptive validity and enforceability of Dennis Group's subordination of its mechanic's lien. The Court reserves the remaining elements of the Lenders' declaratory judgment claim related to the timeliness, scope and validity of the mechanic's lien for further consideration in its Second Summary Judgment Ruling. Dennis Group's remaining claims in avoidance of the presumptive validity of its subordination are reserved for trial.

2.      The Lenders' Partial Cross-Motion for Summary Judgment on Count One of Dennis Group's Complaint for a declaratory judgment is GRANTED in part, but only as to the presumptive validity and enforceability of Dennis Group's subordination of its mechanic's lien. The Court reserves the remaining elements of Dennis Group's declaratory judgment claim related to the timeliness, scope and validity of the mechanic's lien and the validity of the

Lenders' mortgage for further consideration in its Second Summary Judgment Ruling. Dennis Group's remaining claims in avoidance of the presumptive validity of its subordination are reserved for trial.

The Court will defer entry of any final judgment herein pending further proceedings.[30]

**IT IS SO ORDERED** at Hartford, Connecticut this 4th day of January 2023.

*James J. Tancredi*
*United States Bankruptcy Judge*
*District of Connecticut*

---

[30] The Court defers entry of a final judgment based on several procedural grounds. *See* Fed. R. Civ. P. 56(g) (court may enter order stating the undisputed material facts established in the case if it does not grant all relief requested by the motion); Fed. R. Civ. P. 58(a) (every judgment must be set out in a separate document unless otherwise specified in the Rule); Fed. R. Civ. P. 58(b)(1–2) (entering judgment); Fed. R. Civ. P. 58(c) (time of entry of judgment); *see also* Fed. R. Civ. P. 56(f) (after notice and a reasonable opportunity to respond, a court may also enter judgment for nonmovant as the prevailing party on various counts).